**PUBLISH**

**April 19, 2011**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

| | |
|---|---|
| In the Matter of: C.W. MINING COMPANY, d/b/a Co−op Mining Company, <br><br>    Debtor. <br>———————————————— <br>C.O.P. COAL DEVELOPMENT COMPANY, <br><br>    Appellant, <br><br>v. <br><br>C.W. MINING COMPANY; KENNETH A. RUSHTON, Trustee; AQUILA, INC.; HIAWATHA COAL COMPANY, INC., <br><br>    Appellees. | No. 10-4054 |

---

**APPEAL FROM THE UNITED STATES BANKRUPTCY**
**APPELLATE PANEL FOR THE TENTH CIRCUIT**
**(BAP No. 09-0018-UT)**

---

David L. Pinkston (Kim R. Wilson and P. Matthew Cox, with him on the briefs), Snow Christensen & Martineau, Salt Lake City, Utah, for Appellant.

Michael N. Zundel (Aaron B. Millar, with him on the brief), Prince, Yeates & Geldzahler, Salt Lake City, Utah, for Appellee Kenneth A. Rushton, Trustee.

Brent D. Wride (Steven W. Call and Elaine A. Monson, with him on the brief), Ray Quinney & Nebeker P.C., Salt Lake City, Utah, for Appellee Aquila, Inc.

---

Before **KELLY**, **McKAY**, and **MATHESON**, Circuit Judges.

_____

**MATHESON**, Circuit Judge.

_____

This appeal asks whether the bankruptcy court correctly determined that the Coal Operating Agreement (the "Agreement") between the debtor, C.W. Mining Company ("CWM"), and appellant, C.O.P. Coal Development Company ("COP"), was property of the debtor's bankruptcy estate and could therefore be assumed and sold by the trustee. COP claims that the Agreement automatically terminated shortly after the bankruptcy petition was filed and that the bankruptcy court erred in determining that the Agreement was property of the estate. During the pendency of this appeal, the trustee filed a motion to dismiss, arguing that the appeal is now moot because the Agreement has been sold from the estate. Exercising our jurisdiction pursuant to 28 U.S.C. § 158(d)(1), we deny the trustee's motion to dismiss for mootness and affirm the bankruptcy court's decision.

## I. BACKGROUND

COP and CWM entered into the Agreement in March 1997. The Agreement allowed CWM to mine and remove coal from certain land owned or controlled by COP, and it required CWM to pay royalties to COP on the coal that was removed from the mine.

A. *Pre-Bankruptcy Proceedings*

On October 30, 2007, the federal district court for Utah entered a $24.8 million judgment against CWM in a breach of contract action brought by appellee Aquila, Inc.

On November 9, 2007, COP notified CWM that CWM had defaulted under the terms of the Agreement by failing to make its scheduled royalty payments and to provide an accounting of the coal removed. In the letter, COP identified the steps CWM needed to take to cure the default. The default provision of the Agreement provides:

> If [CWM] shall not comply with any of the provisions, or covenants, or agreements herein written and contained, and such default shall continue for a period of 60 days after service of written notice, by certified or registered mail, by [COP] identifying the default and specifying with reasonable particularity the nature and extent thereof, then and in such event this Agreement may be terminated and all of the rights of [CWM] shall cease and be wholly determined and [COP] may at once take possession of any or all of the properties herein described.

Aplt. App., Vol. II at COP512.

Shortly after entry of judgment in its favor, Aquila filed a motion in the district court seeking entry of a supplemental order to help enforce its judgment against CWM. Aquila filed the motion because of the "significant risk that CWM will attempt to transfer its assets to prevent Aquila from executing and recovering its damages." *Id*. at COP683. On December 19, 2007, the district court granted the motion and entered an order prohibiting CWM from taking any action to transfer or dispose of its assets or to terminate the Agreement ("the Supplemental Order").

On January 3, 2008, COP sent a letter to CWM giving notice that "as per the terms of the 1997 Coal Operating Agreement between [COP] and [CWM], the lease will be canceled at the end of the notice period unless the default is cured prior to the end of the 60 day notice period." *Id*. at COP525. On January 5, COP sent CWM another letter

-3-

recounting a conversation between the president of CWM, Charles Reynolds, and the president of COP, J.O. Kingston, about whether CWM could do anything to continue its mine operations. The letter stated that CWM would have to agree to certain terms before COP would consider a new coal operating agreement, including CWM's acknowledging that the Agreement "will cancel if default is not cured by the close of business on January 8th, 2008." *Id*. at COP527. The letter instructed that Mr. Reynolds should sign it if the terms were agreeable to CWM. He did so.

On January 6, COP sent a third letter to CWM, thanking CWM for its interest in negotiating a new coal operating agreement. COP reiterated that it would try to negotiate a new coal operating agreement only if CWM agreed to certain terms, including "[i]f CWM fails to pay to COP, by wire transfer, before the close of business on January 8, 2008 all amounts in default under the 1997 Agreement, the 1997 Agreement shall be forever terminated, without further notice." *Id*. at COP530. Mr. Reynolds also signed this letter based on COP's instructions.

B. *Bankruptcy Proceedings*

On January 8, 2008, at 3:36 p.m. MST, Aquila and a group of creditors filed an involuntary Chapter 11 bankruptcy petition against CWM in the Bankruptcy Court for the District of Utah. In November 2008, the case was converted to a Chapter 7 proceeding, and a trustee was appointed.

After his appointment, the trustee filed a motion for an extension of time to decide whether to assume or reject the Agreement under 11 U.S.C. § 365. In response, COP

-4-

argued that there was no lease for the trustee to assume because CWM did not cure its defaults and the Agreement automatically terminated at the close of business on January 8, 2008. COP also filed a separate motion to require the trustee to assume or reject the Agreement immediately, and repeated the same argument about the Agreement's termination.

The bankruptcy court held four days of evidentiary hearings on the motions and then entered an order granting the trustee's motion and denying COP's motion, thereby concluding that the Agreement was property of the estate that the trustee could assume. COP appealed the bankruptcy court's decision to the Bankruptcy Appellate Panel ("BAP"). While the BAP appeal was pending, on December 10, 2009, the bankruptcy court issued an order in an adversary proceeding between the trustee and COP declaring that the January 5 and 6, 2008 letters had no legal effect and violated the district court's Supplemental Order. On February 3, 2010, the BAP affirmed the bankruptcy court's decision. COP filed its appeal with this court on March 4, 2010.

C. *Bankruptcy Proceedings After the Filing of the Notice of Appeal*

On May 3, 2010, the trustee agreed to sell the Agreement and other mine assets to Rhino Energy LLC. On the same day, the trustee filed a motion in bankruptcy court seeking approval of the assumption and proposed sale of the Agreement. On August 4, the bankruptcy court entered the Sale Order, which authorized the trustee to assume the Agreement and approved the sale. The Sale Order found that Rhino was a good faith purchaser entitled to the protections of 11 U.S.C. § 363(m). The Sale Order was not final

-5-

for seven days, but COP did not file a motion to stay the order. On August 25, the sale closed as approved by the Sale Order. The trustee subsequently filed a motion to dismiss this appeal as moot.

## II. MOTION TO DISMISS FOR MOOTNESS

We first address the trustee's motion to dismiss this appeal as moot based on 11 U.S.C. § 363(m) or under the equitable mootness doctrine. Although COP's appeal comes perilously close to the edge of the mootness cliff, we do not think it should fall off.

The trustee reasons that this appeal is moot in light of § 363(m) because the Agreement was sold to a good faith purchaser, COP did not seek a stay of the Sale Order, and a ruling for COP in this appeal that the Agreement was not property of the estate would affect the validity of the sale of the Agreement to Rhino.[1] Subsection 363(m) provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

We have previously explained the purpose behind § 363(m):

In order to protect the public's interest in finalizing bankruptcy sales to encourage

---

[1]COP argues that § 363(m) does not apply to this appeal because COP is contesting the bankruptcy court's decision that the Agreement was property of the estate, not challenging the Sale Order itself. This appeal is not moot whether or not § 363(m) applies because, as explained below, the trustee has not shown that COP has no remedy if it wins this appeal.

-6-

buyers to purchase the debtor's property, to prevent injury to creditors, and to insure that adequate sources of financing remain available, § 363(m) of the Bankruptcy Code protects the validity of certain sales by the trustee from the potential consequences of an appeal, if the order authorizing the sale is not stayed.

*Osborn v. Durant Bank & Trust Co.* (*In re Osborn*), 24 F.3d 1199, 1203 (10th Cir. 1994) *abrogated in part on other grounds by Eastman v. Union Pacific R.R. Co.*, 493 F.3d 1151, 1156 (10th Cir. 2007).

No one disputes that the Agreement was sold from the debtor's estate to a good faith purchaser and that COP did not seek to stay the sale. The mootness question turns on what relief is available to COP if it were to prevail in this appeal. *See*, *e.g.*, *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992) (noting that appeal should be dismissed as moot if it is "impossible for the court to grant any effectual relief whatever" (quotation omitted)); *Osborn*, 24 F.3d at 1203 (holding "that because it is not impossible for the court to grant some measure of effective relief, the Osborns' appeal is not moot"). Under our decisions and the facts of this case, § 363(m) forecloses any remedy to COP that would affect the validity of the trustee's sale. But it does not preclude a remedy that would not affect the validity of the sale.

In *Osborn*, we explained that, "[b]y removing those remedies that would affect the validity of a sale to a good faith purchaser, § 363(m) moots some appeals, namely, those in cases where the only remedies available are those that affect the validity of the sale." *Id*. at 1203-04 (footnote omitted). But "where state law or the Bankruptcy Code provides remedies that do not affect the validity of the sale, § 363(m) does not moot the appeal."

*Id.* at 1204.  Recognizing the bar in § 363(m) against upsetting the sale of their property, the appellants in *Osborn* argued their appeal was not moot because a ruling in their favor could support the recovery of equitable monetary relief.  *See id.* at 1204.  We agreed with the *Osborn* appellants and denied the motion to dismiss their appeal as moot, noting that Texas law might afford some relief under constructive trust principles.  *Id.*  Accordingly, even if § 363(m) would bar a sale-invalidation remedy for COP, this appeal would not be moot if COP could pursue a remedy that does not affect the validity of the sale.

At oral argument, COP suggested it may be able to recover monetary relief if it succeeds in this appeal, and our cases have acknowledged that possibility.  *See Osborn*, 24 F.3d at 1204; *Golfland Entm't Ctrs., Inc., v. Peak Inv., Inc. (In re BCD Corp.)*, 119 F.3d 852, 857 ("Utah law, similar to the Texas law in *Osborn*, provides for equitable remedies under the principles of constructive trusts.").  The burden of showing mootness is on the trustee, which here means showing that COP would not have such a remedy. *See Search Market Direct, Inc. v. Jubber (In re Paige)*, 584 F.3d 1327, 1336-37 (10th Cir. 2009) (holding that appeal was not moot because appellees had failed to carry their burden of proving that there was no relief the court could order); *Suter v. Goedert*, 504 F.3d 982, 986 (9th Cir. 2007) (noting that "burden of establishing mootness is on the party advocating its application," and concluding that appellees had not established mootness because they did not "affirmatively demonstrate" that there was no relief available to appellants).

-8-

Because the trustee has not affirmatively foreclosed the possibility that COP might be entitled to alternative relief that would not affect the validity of the sale, the trustee has not established that this appeal is moot. The trustee is left with the equitable mootness doctrine.

The equitable mootness doctrine allows a court to decline to hear a bankruptcy appeal, even when relief could be granted, if implementing the relief would be inequitable. *See In re Paige*, 584 F.3d at 1337-38. We have adopted this doctrine in the context of Chapter 11 reorganization plans, *see id*., but we have not applied it in the Chapter 7 setting. Even if it does apply, we are not required to do so as it is discretionary with the court. *See id*. at 1335 n.7 ("[T]he doctrine of equitable mootness is rooted . . . in the court's discretionary power to fashion a remedy in cases seeking equitable relief."). Rather than decide whether the doctrine can be applied, and, if so, weigh the doctrine's six factors in this case in the face of an underdeveloped record on this issue, we think the better and more appropriate course is to resolve this appeal on the merits.

### III. DISCUSSION OF THE MERITS

We now turn to the merits. "'Although this appeal is from a decision by the BAP, we review only the Bankruptcy Court's decision.'" *Gillman v. Ford* (*In re Ford*), 492 F.3d 1148, 1153 (10th Cir. 2007) (quoting *Alderete v. Educ. Credit Mgmt. Corp.* ( *In re Alderete*), 412 F.3d 1200, 1204 (10th Cir. 2005)). We review matters of law de novo, and we review factual findings made by the bankruptcy court for clear error. *Mathai v. Warren* (*In re Warren*), 512 F.3d 1241, 1248 (10th Cir. 2008).

COP challenges the bankruptcy court's decision that the Agreement was property of the estate that could be assumed and sold by the trustee. The bankruptcy court concluded that the Agreement did not provide for automatic termination when the 60-day default notice period expired and that COP needed to take additional steps to terminate the Agreement. The court further determined that by the time the 60-day notice period had run (the close of business on January 8, 2008), the involuntary petition had been filed and the automatic stay under 11 U.S.C. § 362 prohibited COP from taking action to terminate the Agreement without first getting relief from the stay. The court therefore held that the unexpired Agreement was property of the estate and could be assumed by the trustee pursuant to 11 U.S.C. § 365.

COP argues here, as in the bankruptcy court, that the Agreement automatically terminated at the close of business on January 8, 2008, when CWM failed to cure its default by the end of the 60-day notice period. COP therefore contends that the trustee could not assume the Agreement because it was not property of the estate under 11 U.S.C. § 541(b)(2).[2] That section provides that if a lease expires automatically by its

---

[2] Section 541(b)(2) states:

(b) Property of the estate does not include . . .

(2) any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease before the commencement of the case under this title, and ceases to include any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease during the case[.]

terms after a bankruptcy petition is filed, then it can no longer be included as property of the estate. *See id*.

Resolution of this appeal turns on whether the Agreement required COP to take additional steps to terminate the Agreement after the end of the 60-day notice period or whether the Agreement provided for automatic termination at the end of the 60-day notice period. The answer comes from the plain language of the Agreement.

COP argues that the Agreement unambiguously provided for automatic termination if CWM failed to cure its defaults by the end of the 60-day period. COP next asserts that if the Agreement required additional action for termination, COP took such action by sending letters to CWM on January 3, 5, and 6 (the "January letters"), which notified CWM that the Agreement would automatically terminate unless CWM cured its defaults. Finally, COP argues that the January letters may also be considered as evidence of the parties' intent that the Agreement would automatically terminate without further action by COP.

A. *The Agreement and Termination*

COP claims that the bankruptcy court erred in concluding that COP was required to take additional action after the expiration of the 60-day notice period because there was no explicit language in the Agreement about further action. The relevant text is in paragraph nine:

> If [CWM] shall not comply with any of the provisions, or covenants, or agreements herein written and contained, and such default shall continue for a period of 60 days after service of written notice, by certified or registered mail, by

-11-

[COP] identifying the default and specifying with reasonable particularity the nature and extent thereof, then and in such event this Agreement may be terminated and all of the rights of [CWM] shall cease and be wholly determined and [COP] may at once take possession of any or all of the properties herein described.

Aplt. App., Vol. II at COP512.

The bankruptcy court concluded:

The Agreement clearly states that COP *may* terminate the Agreement if the Debtor fails to cure within the 60-day cure period. Although the Agreement does not include what specific action is needed, COP must take some action in order to exercise its discretionary authority at the end of the 60-day period to terminate the Agreement.

*Id.* at COP496.

COP disagrees with the bankruptcy court's conclusion that the permissive word "may" required COP to take additional action to terminate the Agreement. COP argues that "[t]his inference contradicts the plain language of the Operating Agreement that after the 60 day notice period COP 'may *at once* take possession of any or all the properties herein described.'" Aplt. Br. at 18 (quoting Aplt. App., Vol. II at COP512) (emphasis added by COP). COP asserts that "[t]he immediacy of the Operating Agreement language is inconsistent with any additional notice requirement at the end of the 60 day period." *Id.*

The trustee argues that COP quotes out of context. Additional key language of paragraph nine states that if CWM's "default shall continue for a period of 60 days after service of written notice, . . . then and in such event this Agreement may be terminated and all of the rights of [CWM] shall cease and be wholly determined and [COP] may at

-12-

once take possession." Aplt. App., Vol. II at COP512. The trustee contends that the Agreement "demonstrates a temporal progression of events: (1) written notice of default, (2) default period lasting 60 days 'after' service of the notice, (3) 'then' the [Agreement] may be terminated, and upon which occurrence (4) all of CWM's rights shall cease, and (5) COP may at once take possession." Aplee. Br. at 32.

In accord with Utah law, the bankruptcy court reached its decision by determining the intent of the parties from the plain language of the Agreement. As the Utah Supreme Court has explained:

> In interpreting a contract, the intentions of the parties are controlling. We first look to the four corners of the agreement to determine the intentions of the parties. If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law.

*Cent. Fla. Invs., Inc. v. Parkwest Assocs*., 40 P.3d 599, 605 (Utah 2002) (quotation, citations, and alteration omitted).

We agree with the trustee that the language of the Agreement is unambiguous and supports the bankruptcy court's determination that the Agreement did not provide for automatic termination. COP needed to take additional action to exercise its discretionary authority to terminate the Agreement after the 60-day notice period expired. The Agreement established a step-by-step termination process. Only *after* CWM has failed to cure its default at the end of the 60-day notice period "may" COP then terminate the Agreement.

The conditional language "may be terminated" gives COP the option to terminate;

-13-

it does not provide for automatic termination when the 60-day notice period ends. By then, of course, COP could not take action to terminate because it was foreclosed from doing so under the automatic stay in 11 U.S.C. § 362.[3]

B.  *The January Letters*

COP next argues that the January letters establish that the Agreement was terminated by the end of the 60-day period. This argument takes two forms. First, in its opening brief, COP claims that the letters satisfied any additional action required to terminate the Agreement. *See* Aplt. Br. at 18. Second, at oral argument COP suggested that the letters demonstrate the parties' intent that COP did not need to take any further action at the end of the 60-day period and that, unless CWM cured its defaults, the Agreement would automatically terminate at the close of business on January 8, 2008. The bankruptcy court refused to consider these letters because they improperly attempted to provide for the Agreement's termination in violation of the district court's Supplemental Order.

We further note that the trustee submitted a supplemental appendix on appeal containing a December 10, 2009 order from the bankruptcy court arising from an adversary proceeding between the trustee and COP. In the order, the court held that the January 5 and 6 letter agreements "are declared of no legal effect and avoided by reason of the fact that they were entered into in violation of the United States District Court's Supplemental Order in Aid of Enforcement of Judgment entered on December 19, 2007."

---

[3]COP does not challenge this portion of the bankruptcy court's decision.

Aplee. Supp. App. at 312.

At oral argument, COP argued that the bankruptcy court's December 10, 2009 order did not prevent consideration of the January letters as evidence of the parties' intent. The trustee argues in his brief, however, that consideration of the January letters violates principles of contract law. We agree. Under Utah law, when contract language is unambiguous, as it is here, the plain meaning of that language determines the parties' intent. *See Mid-America Pipeline Co. v. Four-Four, Inc.*, 216 P.2d 352, 356 (Utah 2009); *Cent. Fla. Invs.*, 40 P.3d at 605. Extrinsic evidence such as the January letters should not be considered under these circumstances. *See Mid-America*, 216 P.2d at 356 ("We consider extrinsic evidence of the parties' intentions only if the contractual language is ambiguous."). Moreover, COP's argument that the January letters met any action-to-terminate requirement conflicts with our and the bankruptcy court's reading of the Agreement as requiring the additional termination action to occur *after* the 60-day notice period expired.

* * *

We close our analysis by returning to the Bankruptcy Code. Section 541(b)(2) would prevent the Agreement from being included in the estate only if the Agreement automatically terminated. Because the bankruptcy court correctly determined that the Agreement did not automatically terminate, § 541(b)(2) does not apply. The Agreement remained estate property that the trustee could assume and sell.

As we noted above, COP does not challenge the second part of the bankruptcy

-15-

court's determination that the automatic stay prevented COP from taking further action to terminate the Agreement. Instead, COP focuses the remainder of its opening brief on challenging the BAP's decision. Because we agree with the bankruptcy court's determination that the Agreement did not automatically terminate and was property of the estate that could be assumed and sold by the trustee, we need not reach the BAP's decision, which relied on somewhat different reasoning to reach the same result.[4]

## IV. CONCLUSION

For the foregoing reasons, we DENY the trustee's motion to dismiss the appeal as moot, and we AFFIRM the bankruptcy court's decision.

---

[4] In light of our decision, we also need not reach the trustee's collateral estoppel argument.