**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

| | |
|---|---|
| In re: RESON LEE WOODS, a/k/a Lee Woods, d/b/a Bar LS Farms, f/d/b/a Bar LS Properties Inc.; SHAUN K. WOODS, a/k/a Shaun Woods, d/b/a Bar LS Farms, f/d/b/a Bar LS Properties Inc., <br><br> Debtors. <br><br> FIRST NATIONAL BANK OF DURANGO, <br><br> Appellant, <br><br> v. <br><br> RESON LEE WOODS; SHAUN K. WOODS, <br><br> Appellees. | No. 12-1111 |

---

**Appeal from the Bankruptcy Appellate Panel**
**for the Tenth Circuit Court of Appeals**
**(B.A.P. No. 11-083-CO)**

---

Garry R. Appel, Appel & Lucas, P.C., Denver, Colorado, for Appellant.

Cheryl A. Thompson, Thompson Brownlee, Vail, Colorado (Daniel J. Lowenberg, Mountain Law Group, L.L.C., Montrose, Colorado, with her on the brief), for Appellees.

---

Before **HOLMES**, **O'BRIEN**, and **MATHESON**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

Appellant First National Bank of Durango ("First National Bank") appeals from the Bankruptcy Appellate Panel's ("BAP's") decision affirming the bankruptcy court's confirmation of the Chapter 12 bankruptcy plan of Appellees Reson and Shaun Woods ("Debtors"). Although First National Bank raises several issues on appeal, we only reach the first: whether Debtors are permitted to seek relief under Chapter 12 as "family farmers." In deciding this issue, we are presented with a question of first impression for our court—namely, when does a debt "for" a principal residence "arise[] out of a farming operation"? *See* 11 U.S.C. § 101(18)(A). We conclude that a debt so arises if it is directly and substantially connected to any of the activities constituting a "farming operation" within the meaning of 11 U.S.C. § 101(21). More specifically, when the debt at issue is loan debt, as here, we conclude that an objective "direct-use" test serves as the optimal vehicle for discerning when the direct-and-substantial-connection standard is satisfied. That is, if the loan proceeds were used directly for or in a farming operation, the debt "arises out of" that farming operation. This was not the test applied by the bankruptcy court (or the BAP).

Because we conclude that the bankruptcy court did not apply the proper legal standard and test in its analysis of Debtors' eligibility for Chapter 12 relief,

2

we deem it appropriate and prudent to remand for that court to apply the correct law to the facts of this case. Thus, we **vacate** the bankruptcy court's judgment and **remand** the case to the bankruptcy court for further proceedings.

## I

Debtors are a husband and wife who, in 2007, purchased farmland in southwestern Colorado on which to run their hay-farming operation. Until they filed for bankruptcy in November 2010, Debtors accumulated various debts, some of which were related to their farming operation and others of which were not. One such debt is a $480,000 loan Debtors obtained from First National Bank. Approximately $284,000 of this loan was used to pay off a loan from another bank that was obtained to purchase Debtors' farmland. The parties do not dispute that this portion of the debt "arises out of" a farming operation; nor do they dispute that the majority of the remaining loan proceeds—what we call the "construction loan"—were used to construct Debtors' principal residence on the farmland.

It is the construction loan that is our primary focus. This is because Debtors petitioned for Chapter 12 relief as family farmers. A "family farmer" is, *inter alia*, an individual or individuals

> not less than 50 percent of whose aggregate noncontingent, liquidated debts (excluding a debt for the principal residence of such individual or such individual and spouse unless such debt arises out of a farming operation), on the date the case is filed, arise out of a farming operation owned or operated by such

3

individual or such individual and spouse . . . .

11 U.S.C. § 101(18)(A). From the outset of this case—and again on appeal—First National Bank has maintained that, if the construction loan is excluded from the debt total because it does not "arise out of" a farming operation, less than fifty percent of Debtors' aggregate noncontingent, liquidated debts "arises out of" a farming operation, which would preclude Debtors from qualifying as family farmers. And, if Debtors are not "family farmers," they cannot seek relief under Chapter 12. *See id.* § 109(f).

The bankruptcy court disagreed with First National Bank. It concluded that the construction loan should not be excluded from the debt total under § 101(18)(A) because it "ar[ose] from farm operations." Aplt. App. at 797 (Hr'g Tr., dated May 10, 2011). In reaching this conclusion, the bankruptcy court found that the residence was "an integral part of the farm operation in [the] sense that" (1) the farming operation's office and records were located in the residence; and (2) the residence was located on the farmland, placing it in proximity to the farming operation. *Id.*

The BAP agreed with the bankruptcy court that the construction loan arose out of a farming operation. It recognized that "[f]ew courts have considered when a debt 'arises out of a farming operation.'" *Id.* at 1381 (B.A.P. Op., filed Feb. 27, 2012). The BAP elected to adopt the approach taken in *In re Saunders*, 377 B.R. 772 (Bankr. M.D. Ga. 2007). Accordingly, it applied the following test: "to 'arise

4

out of a farming operation' the purpose of a debt must have *some connection* to the debtor's farming activity." Aplt. App. at 1382 (emphasis added) (citation omitted) (internal quotations marks omitted). Relying on the same two factors that the bankruptcy court identified—that is, generally, the presence of the farming operation's office and records in the residence, and the residence's proximity to the farm—the BAP concluded that the residence was "connected to [Debtors'] farming activities" and thus "including the construction . . . loan in the farm debt calculation was proper." *Id.* at 1383.

This appeal followed.

## II

"Although this appeal is from a decision by the BAP, we review only the Bankruptcy Court's decision." *Miller v. Deutsche Bank Nat'l Trust Co.* (*In re Miller*), 666 F.3d 1255, 1260 (10th Cir. 2012) (quoting *C.O.P. Coal Dev. Co. v. C.W. Mining Co.* (*In re C.W. Mining Co.*), 641 F.3d 1235, 1240 (10th Cir. 2011)) (internal quotation marks omitted); *accord Wagers v. Lentz & Clark, P.A.* (*In re Wagers*), 514 F.3d 1021, 1022 (10th Cir. 2007) (per curiam). "We review matters of law de novo, and we review factual findings made by the bankruptcy court for clear error." *In re Miller*, 666 F.3d at 1260 (internal quotation marks omitted). "[W]e treat the BAP as a subordinate appellate tribunal whose rulings are not entitled to any deference (although they certainly may be persuasive)." *Mathai v. Warren* (*In re Warren*), 512 F.3d 1241, 1248 (10th Cir. 2008); *accord Parks v.*

5

*Dittmar* (*In re Dittmar*), 618 F.3d 1199, 1204 (10th Cir. 2010).

First National Bank contends that the bankruptcy court applied the incorrect legal test to determine whether the construction loan arose out of a farming operation pursuant to 11 U.S.C. § 101(18)(A). It urges us to apply a test that focuses on "whether the funds that gave rise to the debt were used in the farming operation." Aplt. Opening Br. at 14. First, in Part II.A, we interpret § 101(18)(A) and set forth the proper legal standard for determining whether a debt "for" a principal residence "arises out of" a farming operation; that is, a direct-and-substantial-connection standard. Then, we conclude, at least in the loan context, that an objective "direct-use" test—akin to the one First National Bank advances—does in fact provide the optimal means of discerning whether the direct-and-substantial-connection standard is satisfied.

Ultimately, because the bankruptcy court (and the BAP) applied the wrong legal test, we determine in Part II.B that neither of the factors upon which the bankruptcy court relied can, as a matter of law, support classifying Debtors' principal-residence debt as debt that "arises out of a farming operation." And, we conclude that a remand is required so that the bankruptcy court may apply our newly fashioned test in the first instance.

**A**

Our task is one of statutory interpretation. The interpretation of a statute is a legal question; thus, we review the bankruptcy court's interpretation of the

statute de novo.[1] *See In re Stephens*, 704 F.3d at 1283; *Caplan v. B-Line, LLC* (*In re Kirkland*), 572 F.3d 838, 840 (10th Cir. 2009).

We begin by interpreting the phrase "arises out of" in the "family farmer" definition of 11 U.S.C. § 101(18)(A). We read that provision as requiring a direct and substantial connection between the debt and the farming operation. Next, we

---

[1] Debtors contend that the bankruptcy court's decision that the construction loan arose out of a farming operation was purely a factual determination that we can only set aside if clearly erroneous. More specifically, Debtors make the rather perplexing argument that "[t]he bankruptcy court did not adopt *any* [legal] 'test' nor does the law require it to do so[;] it simply evaluated the facts of the case and decided that the debt for this particular residence does 'arise out of' a farming operation . . . ." Aplee. Br. at 21–22 (emphasis added). Although it is true that the bankruptcy court did not explicitly identify the legal test it applied in reaching its conclusion, the court necessarily must have determined that the facts on which it relied were legally sufficient to meet the statute's requirements. Even if it only did this tacitly, the court's interpretation of the statute's requirements is subject to de novo review. *Cf. Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 501 (1984) ("Rule 52(a) does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law."); *Pahls v. Thomas*, 718 F.3d 1210, 1232 (10th Cir. 2013) (noting that when a trial "court commits *legal* error en route to a *factual* determination, that determination is thereby deprived of any special solicitude it might otherwise be owed on appeal"). Were this not the case, in virtually every instance in which bankruptcy courts (or, for that matter, district courts) purported to (in Debtors' words) "simply evaluate[] the facts," Aplee. Br. at 22, in determining whether the requirements of a particular statute were satisfied, those courts' determinations would be effectively insulated completely from de novo review. Such an outcome would be improper, at the very least because it would not reflect the realities of the adjudicatory process. Specifically, before deciding whether the requirements of a statute are satisfied by certain facts, a court must—even if tacitly—conduct a legal analysis of what the statute's terms require. In other words, a court must first give a statute's language legal meaning in order for it to determine whether a given set of facts satisfies that statute. And it cannot be gainsaid that discerning the import of a statute is a legal process; consequently, that process is subject to de novo review. Accordingly, we apply de novo review here to the bankruptcy court's tacit legal assessment of the statutory requirements of the family-farmer provision. *See Stephens v. Stephens* (*In re Stephens*), 704 F.3d 1279, 1283 (10th Cir. 2013).

7

examine the tests that courts have commonly applied in this statutory context when determining whether debt "arises out of" a farming operation, in order to assess what test best fits the direct-and-substantial-connection statutory standard. And, in that regard, we conclude that an objective "direct-use" test provides the optimal vehicle for discerning whether the direct-and-substantial-connection standard is satisfied—at least in the loan-debt setting.

### 1

"[I]nterpretation of the Bankruptcy Code starts 'where all such inquiries must begin: with the language of the statute itself.'" *Ransom v. FIA Card Servs., N.A.*, --- U.S. ----, 131 S. Ct. 716, 723 (2011) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)); *see United States v. West*, 671 F.3d 1195, 1199 (10th Cir. 2012) ("[W]e first and foremost look to the statute's language to ascertain Congressional intent."). "[T]he Bankruptcy Code must be construed liberally in favor of the debtor and strictly against the creditor." *In re Warren*, 512 F.3d at 1248 (quoting *Gullickson v. Brown* (*In re Brown*), 108 F.3d 1290, 1292 (10th Cir. 1997)) (internal quotation marks omitted).

"It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)); *see United States v. Sprenger*, 625 F.3d 1305, 1307

8

(10th Cir. 2010) ("If the terms of the statute are clear and unambiguous, the inquiry ends and we simply give effect to the plain language of the statute." (internal quotation marks omitted)). Further, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989); *accord Kunz v. United Sec. Bank* (*In re Kunz*), 489 F.3d 1072, 1077 (10th Cir. 2007).

As noted, a "family farmer" is, in relevant part, an individual or an individual and spouse "not less than 50 percent of whose aggregate noncontingent, liquidated debts (excluding a debt for the principal residence of such individual or such individual and spouse unless such debt arises out of a farming operation), on the date the case is filed, arise out of a farming operation." 11 U.S.C. § 101(18)(A).

We begin our analysis by examining the subsection's structure, as "the meaning of statutory language, plain or not, depends on context." *United States v. Villa*, 589 F.3d 1334, 1343 (10th Cir. 2009) (quoting *Bailey v. United States*, 516 U.S. 137, 145 (1995)) (internal quotation marks omitted); *see Salazar v. Butterball, LLC*, 644 F.3d 1130, 1137 (10th Cir. 2011) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997))

9

(internal quotation marks omitted)); *cf. Davis*, 489 U.S. at 809 ("[S]tatutory language cannot be construed in a vacuum.").

Section 101(18)(A) is perhaps best understood by breaking the provision into its two principal parts: (1) the fifty-percent-farm-debt rule, with its embedded exclusion; and (2) the exception to the rule. The rule requires at least one-half of a family farmer's debt to "arise out of" a farming operation. Part and parcel of this rule is an embedded exclusion. It excludes from the aggregate-debt calculation any debt "for" the family farmer's principal residence. Thus, construed along with its embedded exclusion, the rule provides that an individual (or an individual and his or her spouse) qualifies as a family farmer if at least fifty percent of the individual's aggregate debt "arises out of" a farming operation, excluding debt "for" the individual's principal residence. This rule is qualified in certain instances by an exception. That exception provides that the aggregate debt for determining whether the fifty-percent-farm-debt threshold is met *will* include debt for the principal residence if the debt "arises out of" the farming operation.[2]

---

[2] For clarity's sake, then, the definition provides the following:

- *a rule* for assessing whether the debt of the putative family farmer qualifies for Chapter 12 relief—"not less than 50 percent of [that farmer's] aggregate noncontingent, liquidated debts . . . on the date the case is filed, [must] arise out of a farming operation"

(continued...)

10

The rule separates those who are family farmers—and thus can file under Chapter 12—from those who are not, by requiring, *inter alia*, that at least one-half of the putative family farmer's debt "arise out of" a farming operation. In other words, the fifty-percent-farm-debt rule provides a means to identify true family farmers. "Congress intended Chapter 12 to encourage family farmers to continue farming despite the economic realities that have caused many rural people to exit farming." Katherine M. Porter, *Phantom Farmers: Chapter 12 of the Bankruptcy Code*, 79 Am. Bankr. L.J. 729, 735 (2005); *see Hall v. United States*, --- U.S. ----, 132 S. Ct. 1882, 1894 (2012) (Breyer, J., dissenting) ("Chapter 12 of the Bankruptcy Code helps family farmers in economic difficulty reorganize their debts without losing their farms."); *Watford v. Fed. Land Bank of Columbia* (*In re Watford*), 898 F.2d 1525, 1528 (11th Cir. 1990) ("Congress' intent in passing Chapter 12 of the Bankruptcy Code was to allow farmers to keep their land despite their financial troubles.").

With that objective in mind, in Chapter 12, Congress provided "specialized

---

[2](...continued)

- that contains *an exclusion*—"excluding a debt for the principal residence of such individual"; and

- *an exception* that modifies the aggregate-debt computation of the *rule* by adding back into the equation debt "for" the principal residence of the putative family farmer, if it can be shown that this debt "arises out of a farming operation."

*See* 11 U.S.C. § 101(18)(A).

11

bankruptcy relief for farmers[,] . . . designed to be more generous to debtors than generally applicable bankruptcy law."  Porter, *supra*, at 731; *see* 8 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 1200.01[2], at 1200-4 (16th ed. 2013) ("Before the enactment of chapter 12, most farmers seeking to reorganize under the Code filed for relief under chapter 11.  The plan confirmation requirements of chapter 11, however, often proved difficult for farm debtors to meet, and the success rate for farm reorganizations was low. . . .  In enacting chapter 12, . . . Congress allowed farmers to confirm reorganization plans without providing for payment in full to unsecured creditors.").

But "'[r]ural' and 'farm' are not synonymous[,]" Porter, *supra*, at 730, and Congress sought to ensure that Chapter 12's more generous remedial provisions were only available to those who could be said to be true family farmers.  *See In re Watford*, 898 F.2d at 1528 ("Congress was also concerned that family farmers *only* . . . benefit from the provisions of Chapter 12." (emphasis added)); *In re Vernon*, 101 B.R. 87, 89 (Bankr. E.D. Mo. 1989) ("The provisions ensure that only family farmers—not tax shelters or large corporate entities—will benefit. Consequently, Congress has identified precisely whom Chapter 12 was intended to help." (citation omitted)); *see also* Resnick & Sommer, *supra*, ¶ 1200.01[3][a][i], at 1200-5 ("The definition [of 'family farmer'] has been drafted narrowly so as to limit chapter 12 eligibility to true 'family' farmers and to exclude investors or speculators who use farm losses to shelter non-farm

12

income."). Thus, the fifty-percent-farm-debt rule was one means of identifying true family farmers, who would be eligible for Chapter 12 relief.

Part and parcel of the rule is an exclusion that applies in the ordinary course: it excludes from the aggregate debt (of which one-half or more must be farm debt) the debt "for" one's "principal residence." In other words, one is a family farmer if at least one-half of one's non-principal-residence debt arises out of a farming operation. *See, e.g.*, *In re Quillian*, No. 07-20199, 2007 WL 3046348, at *2 (Bankr. S.D. Tex. Oct. 15, 2007) ("The exclusion provision in 11 U.S.C. § 101(18) excludes a debt such as a mortgage used for the purchase of the principal residence."). The exclusion prevents, for example, one from being disqualified from Chapter 12 relief, even though all of one's non-principal-residence debt arises out of a farming operation, simply because this debt is less than the debt "for" one's "principal residence."

Finally, we turn to the exception. Under the rule, ordinarily the debt for one's principal residence is not included in the aggregate debt; on the other hand, the exception provides that if such debt "arises out of" a farming operation, then it *is* included in the aggregate-debt calculation and also constitutes farm debt for purposes of the rule (because the debt "arises out of" a farming operation). In other words, if the exception applies, the aggregate debt *and* farm-debt portion of the aggregate debt increase by the same amount, which necessarily increases the proportion of one's debt that "arises out of" a farming operation.

13

With this background in mind, we turn to our specific interpretive task of giving meaning to the phrase "arises out of" in this exception. In particular, we must decide how a court should determine whether a debt "for" a principal residence "arises out of" a farming operation for purposes of applying this exception. Significantly, the parties have not identified any cases, and we are not aware of any, that have specifically interpreted the phrase "arise out of" as it is found in the exception. Instead, the courts that have interpreted this phrase—and, as the BAP noted, not many have—have done so when interpreting the fifty-percent-farm-debt rule. *See, e.g.*, Aplt. Opening Br. at 16 ("All of the cases interpret the language ['arise out of a farming operation'] as it is used the second time it appears in the statute[, i.e., immediately after the phrase "on the date the case is filed"]. . . . [T]his matter therefore appears to be one of first impression.").

The language of the phrase "arise out of" is of course essentially identical as it appears in the rule and the exception.[3] And, in that regard, we recognize that "[t]he normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning." *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986) (internal quotation marks

---

[3] The difference between "arise" and "arises" as found in the rule and the exception, respectively, is only a product of references to the plural, "debts," and singular, "debt," respectively; this difference, in our view, is not germane to the meaning of the term. Thus, we view the two terms as essentially identical and use them interchangeably.

14

omitted); *see Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 501 (1998) (discussing "the established canon of construction that similar language contained within the same section of a statute must be accorded a consistent meaning"). Indeed, it is noteworthy that the phrase "arises out of" is repeated in the same sentence; for, as the Supreme Court has recently noted, "the presumption that a given term is used to mean the same thing throughout a statute is at its most vigorous when a term is repeated within a given sentence." *Miss. ex rel. Hood v. AU Optronics Corp.*, --- U.S. ----, 134 S. Ct. 736, 743 (2014) (quoting *Brown v. Gardner*, 513 U.S. 115, 118 (1994)) (internal quotation marks omitted). Consequently, in light of these interpretive principles, we are comfortable looking for guidance to those cases that have construed the phrase "arises out of" in the context of the fifty-percent-farm-debt rule. We do so below, in seeking to determine the appropriate legal test to apply in this factual setting for discerning when the direct-and-substantial-connection standard is satisfied.

However, we also are cognizant of the fact that the phrase as found in the exception has a different—in some respects more narrow—point of focus than the phrase as found in the rule. Notably, the former (that is, the exception) focuses entirely on the debt associated with the putative family farmer's principal residence, whereas the latter (that is, the phrase "arises out of" as found in the rule) relates to all "aggregate noncontingent, liquidated debts." 11 U.S.C. § 101(18)(A). We are not prepared to say at this time that this difference in focus

15

is wholly immaterial and, more specifically, that it has no meaningful implications for how Congress intended the two phrases to operate in the statute. *See United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 213 (2001) ("Although we generally presume that identical words used in different parts of the same act are intended to have the same meaning, . . . the presumption is not rigid, and the meaning [of the same words] well may vary to meet the purposes of the law." (alteration in original) (citation omitted) (internal quotation marks omitted)); *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 19 (1831) ("It has been also said, that the same words have not necessarily the same meaning attached to them when found in different parts of the same instrument: their meaning is controlled by the context. This is undoubtedly true."); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012) ("Though one might wish it were otherwise, drafters more than rarely use the same word to denote different concepts . . . ."). Therefore, we conduct an independent examination of the statute and expressly underscore that our analysis is focused on the phrase "arises out of" as it appears in the exception to the fifty-percent-farm-debt rule.

In the end, we conclude that a debt "for" a principal residence "arises out of" a farming operation only if the debt is directly and substantially connected to the farming operation. Then, we proceed to determine what test is optimal in this factual context—which involves loan debt—for discerning whether this direct-

16

and-substantial-connection standard is satisfied.  We conclude that an objective

"direct-use" test is the best fit.

<h1 style="text-align:center">2</h1>

With the statute's structure outlined, we now turn to its plain language.

The term "farming operation" is defined to "*include*[] farming, tillage of the soil,

dairy farming, ranching, production or raising of crops, poultry, or livestock, and

production of poultry or livestock products in an unmanufactured state."  11

U.S.C. § 101(21) (emphasis added).  This definition is not exhaustive.  *See* 2

Nancy C. Dreher et al., *Bankruptcy Law Manual* § 12:4, at 928–29 (5th ed. 2013)

("The definition of 'farming operation,' which has been in the Code since its

original enactment in 1978, is broad in scope . . . .  Thus, the primary business of

the family farmer . . . need not be the actual tillage of the soil and may be a

related agricultural business that fits within this broad definition."); Barnes Gunn

Kelley, Note, *Chapter 12: Entrepreneur Punishment and Family Favorites*, 15

Drake J. Agric. L. 485, 487–88 (2010) (noting that the statute provides "a non-

exhaustive list of possibilities" of what constitutes a farming operation and that

"[t]his open-ended wording of the statute has left bankruptcy judges with the

case-by-case task of determining whose operations are included and whose are

excluded").

The phrase "arises out of" is left undefined.  "When a statute does not

define a term, we typically give the phrase its ordinary meaning."  *FCC v. AT & T*

*Inc.*, --- U.S. ----, 131 S. Ct. 1177, 1182 (2011) (internal quotation marks omitted); *see Sandifer v. U.S. Steel Corp.*, --- U.S. ----, 134 S. Ct. 870, 876 (2014) ("It is a 'fundamental canon of statutory construction' that, 'unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.'" (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979))); *State Bank of S. Utah v. Gledhill* (*In re Gledhill*), 76 F.3d 1070, 1077 (10th Cir. 1996) ("Courts properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry their ordinary, contemporary, common meaning." (internal quotation marks omitted)).

To "arise" means "[t]o originate; to stem (from)" or "[t]o result (from)." *Black's Law Dictionary* 122 (9th ed. 2009); *see Webster's Third New International Dictionary* 117 (2002) [hereinafter "*Webster's*"] (defining "arise" as "to originate from a specified source"). These definitions all connote *at least* some connection between the object and its source—that is, at least some connection between the debt at issue and a farming operation. Further analysis, however, sheds light on the nature of that connection.

The statute's structure—setting forth a baseline rule and an exception—leads us to believe that the exception must be construed narrowly. Recall, under the rule, that ordinarily the debt for an individual's principal residence is not included in the aggregate debt; it is not considered to "arise out of" a farming operation. In other words, in the normal course—reflecting the

18

statute's default—a debt "for" a principal residence does *not* "arise out of" any farming operations described in § 101(21). Rather, the debt "for" the principal residence—at least most frequently—would arise out of the need for a farmer, like anyone else, to have a place to live.

Congress, however, created an *exception*: in the ordinary course, the rule functions to exclude debt for a principal residence "unless" the exception applies—that is, "unless such debt [for a principal residence] arises out of a farming operation." 11 U.S.C. § 101(18)(A); *see also Webster's*, *supra*, at 2503 (defining "unless" as "except on the condition that" or "except"). In other words, the rule normally applies "unless" the exception is triggered.

Because this is a scheme whereby a default rule is subject to an exception, we are guided by the interpretive principle that exceptions to a general proposition should be construed narrowly. *See Comm'r of Internal Revenue v. Clark*, 489 U.S. 726, 739 (1989) ("In construing [statutes] in which a general statement of policy is qualified by an exception, we usually read the exception narrowly in order to preserve the primary operation of the provision."); *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 403 (2d Cir. 2008) (following the "interpretive principle that statutory exceptions are to be construed narrowly in order to preserve the primary operation of the [general provision]" (quoting *Nussle v. Willette*, 224 F.3d 95, 99 (2d Cir. 2000)) (internal quotation marks omitted)); *see also United States v. Fort*, 472 F.3d 1106, 1123 (9th Cir. 2007)

19

(Fletcher, J., dissenting) ("[An] exception must be construed 'narrowly in order to preserve the primary operation of the provision.'" (quoting *Clark*, 489 U.S. at 739)); 2A Norman J. Singer, *Statutes and Statutory Construction* § 47:11, at 246–47 (6th ed. 2000) ("Subsidiary clauses which limit the generality of a rule are narrowly construed, as they are considered exceptions."); *cf.* Singer, *supra*, § 47:11, at 250–51 ("[W]here a general provision in a statute has certain limited exceptions, all doubts should be resolved in favor of the general provision rather than the exceptions.").

Flowing from this interpretive principle—that we must construe exceptions narrowly—is the related concept that exceptions must not be interpreted so broadly as to swallow the rule. *See Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 530 (2009) (avoiding interpreting an exception in a manner that "would swallow the rule"); *cf. Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1212 (10th Cir. 2006) (interpreting the impeachment exception to Fed. R. Evid. 407 "narrowly, lest it swallow the rule"); *Manchester v. Annis* (*In re Annis*), 232 F.3d 749, 753 (10th Cir. 2000) (rejecting a proposed interpretation of a statutory exemption because it "would swallow the rule"). If Congress were of the view that most or all principal residences of farmers "arise out of" their farming operations, it could have quite easily reflected this view in the statute's terms. For instance, Congress could have simply set forth the rule with a different embedded exclusion—e.g., that not less than fifty percent of a family farmer's

20

total debt must "arise out of" a farming operation, excluding from the debt total any debt for a principal residence that does *not* arise out of a farming operation. Were that the definition of "family farmer," it would be clear that, in Congress's view, family farmers' principal residences ordinarily "arise out of" their farming operations.

But that is not the scheme Congress chose. Accordingly, we must interpret the phrase "arise out of" in a way that allows the rule's exception to function as just that—an exception. *See Clark*, 489 U.S. at 739; *Beretta U.S.A. Corp.*, 524 F.3d at 403; *see also Burrage v. United States*, --- U.S. ----, 134 S. Ct. 881, 892 (2014) ("The role of this Court is to apply the statute as it is written—even if we think some other approach might accor[d] with good policy." (alteration in original) (quoting *Comm'r of Internal Revenue v. Lundy*, 516 U.S. 235, 252 (1996)) (internal quotation marks omitted)); *Sandifer*, 134 S. Ct. at 878 (same). We believe that construing this language to mean that there must be a direct and substantial connection between the debt for a principal residence and the farming operation serves that end. *Cf. Heffley v. Comm'r of Internal Revenue*, 884 F.2d 279, 283 (7th Cir. 1989) (noting that "in order to achieve the congressional intent[, certain] exceptions must be narrowly applied and the corresponding exclusions broadly interpreted"). In other words, applying the foregoing settled principles of statutory construction, we believe that construing the phrase "arise out of" to embody a direct-and-substantial-connection standard serves to ensure

21

that the exception operates narrowly, for this standard only permits limited play in the joints between the debt for the principal residence and the farming operation. *See Webster's*, *supra*, at 640 (defining "direct," *inter alia*, as meaning "marked by absence of an intervening agency, instrumentality, or influence: IMMEDIATE"); *id.* at 2280 (defining "substantial," *inter alia*, as meaning "considerable in amount" and "something of moment").

A statutory standard requiring anything less than a direct and substantial connection, in our view, could not have been envisioned by Congress because a lesser standard, in application, would present a serious and unacceptable risk of the exception consuming the rule. For example, in many cases, very little ingenuity would be needed to conjure up an indirect connection of some kind between a family farmer's principal residence and his farming operation. Indeed, nearly every family farmer's principal residence could be said to have at least an indirect connection of some kind to his or her farming operation; among other things, the connection could be as tenuous as the principal residence being the place where the farmer keeps the clothing in which he farms.

Put another way, in light of our statutory analysis *supra*—indicating that the default rule is premised in part upon the view that ordinarily, debt for a principal residence will *not* "arise out of" a farming operation—we cannot conclude that, in enacting the rule's exception, Congress intended to obliterate that foundational view regarding principal-residence debt and render the

22

exception more akin to the rule. Yet, interpreting the phrase "arise out of" as embodying anything less than a direct-and-substantial-connection standard would present an unacceptable risk of precisely that outcome.

We recognize that divining the appropriate standard—*viz.*, the direct-and-substantial-connection standard—only takes us part of the way in the analysis. We next must determine what test provides the optimal vehicle for discerning when this standard is satisfied. With this objective in mind, we examine below the tests that courts have commonly applied. They have done so when construing the phrase "arise out of" as it appears in the fifty-percent-farm-debt rule. From this examination, we identify a test that will permit us to optimally discern—at least in the loan-debt context, as here—when the direct-and-substantial-connection standard is satisfied. Specifically, we conclude that this test is an objective "direct-use" test.[4]

**3**

Courts have commonly applied at least three tests in discerning whether debt "arises out of" a farming operation: the "but-for" test, the "some-connection" test, and the "direct-use" test. After examining the but-for and some-connection

---

[4] We use the phrase "loan debt" broadly to encompass any type of debt that provides funds to spend on other goods or services. We only hold that an objective "direct-use" test is optimal for determining whether the direct-and-substantial-connection statutory standard is satisfied *in the loan-debt context*. We are only charged with deciding the case before us, which involves loan debt; so, we do not opine on whether an objective "direct-use" test would be similarly optimal in other contexts.

tests and rejecting them because they are not congruent with the direct-and-substantial-connection standard we believe Congress contemplated when it selected the phrase "arise out of," we discuss and endorse the "direct-use" test. At least in the loan-debt context, we consider that test an optimal fit for the direct-and-substantial-connection standard.

The but-for test provides that a debt "arises out of a farming operation" if but for the debt, there would be no farm. *See, e.g.*, *In re Reak*, 92 B.R. 804, 805–06 (Bankr. E.D. Wis. 1988) (identifying several cases where the courts applied the but-for test); *see also* Kelley, *supra*, at 492 ("The 'but for' test can be expressed as: but for the indebtedness created by the family farmer, there would be no farm."). The but-for test was at least in part derived from the Seventh Circuit's decision in *In re Armstrong*, 812 F.2d 1024 (7th Cir. 1987), where the court had to decide what portion of the debtor's income was derived "from a farming operation" under an earlier version of 11 U.S.C. § 101. *See* 812 F.2d at 1026. Specifically, the Seventh Circuit held that the money earned from the debtor's sale of his farm machinery was income from his farming operation because the "farm machinery was inescapably interwoven with his farming operation"—that is, "[h]e bought the machinery so the farm could exist and prosper. But for the machinery, there would be no farm." *Id.*

The bankruptcy court in *In re Rinker*, 75 B.R. 65 (Bankr. S.D. Iowa 1987), relied on *In re Armstrong* to decide whether certain debt arose from a farming

24

operation. *See* 75 B.R. at 67–68. The debtor in *In re Rinker* had entered into a settlement with his three siblings to purchase their respective shares of their parents' farmland. *See id.* at 66. Approximately six years later, the debtor filed for Chapter 12 protection as a "family farmer" because he was unable to pay his siblings the outstanding amount of the settlement agreement. *See id.* at 66–67. The court looked to the "subject of the settlement"—the farmland—in holding that the debt arose out of a farming operation. *Id.* at 68. After recognizing that the debtor's "purpose in settling the case was to preserve the[ ] farming operation," the court applied the but-for test, reasoning that "[w]ithout the land, the [debtor] would have no farm." *Id.*

Other courts have followed suit by relying on *In re Armstrong* in applying the but-for test. *See In re Reak*, 92 B.R. at 805–06 (describing the but-for test as a "common thread" in analogous bankruptcy decisions and holding that the debt used to acquire farmland was "inescapably interwoven with farming operations" and "but for [that debt], there would be no farm" (internal quotation marks omitted)); *In re Roberts*, 78 B.R. 536, 537 (Bankr. C.D. Ill. 1987) (following *In re Armstrong* and holding that "[t]he debts in question in the instant case arose when the Debtor inherited the farm from her mother. The estate taxes have to be paid in order for the Debtor to keep the farm. But for the payment of the estate taxes, there would be no farm."); *see also In re Teolis*, 419 B.R. 151, 161 (Bankr. D.R.I. 2009) (applying the but-for test set forth in *In re Reak*).

In our view, the but-for test does not comport with the phrase "arises out of" as found in the exception. If a court were applying a but-for test, it would ask, but for the debt "for the principal residence," would there be a "farming operation"? *See In re Reak*, 92 B.R. at 806 ("[B]ut for the land acquired by the debtor [through the debt at issue], there would be no farm . . . ." (internal quotation marks omitted)); *In re Roberts*, 78 B.R. at 537 ("But for the payment of the estate taxes, there would be no farm."); *In re Rinker*, 75 B.R. at 68 ("Without the [debt for the] land, the [debtor] would have no farm."). Common sense and logic tell us that the answer to this question with respect to debt for a principal residence almost always would be yes—that is, there almost always would still be a farming operation, regardless of any debt obtained for a principal residence. In other words, the incurring of debt for family farmers' principal residences would seldom be dispositive of the existence *vel non* of the farming operations at which they work. Indeed, in this case, Debtors' farming operation preexisted the construction of their residence. The consequence of this situation—of the debt "for" the principal residence, in almost every instance, not being a but-for cause of the existence of the farming operation—would be that the exception would almost never apply.

Although we must narrowly construe an exception, *see Clark*, 489 U.S. at 739, employing the but-for test in this context would have a limiting effect that we are hard-pressed to conclude that Congress intended. In other words,

application of the test would almost entirely eviscerate the exception; were we to adopt the but-for test, the exception would rarely, if ever, apply. Given its patent interest in assisting genuine family farmers, we cannot conclude that Congress contemplated a test that would virtually negate a statutory exception that it carefully crafted to help true family farmers satisfy the fifty-percent-farm-debt threshold. *See Sandifer*, 134 S. Ct. at 877 (rejecting petitioner's interpretation of a statutory "exception" because it "runs the risk of reducing [the statutory exception] to near nothingness"); *see also Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty 'to give effect, if possible, to every clause and word of a statute.'" (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955))). Thus, in this context we decline to endorse the but-for test.

As noted, other courts have applied what we have labeled a "some-connection" test. This test focuses on whether the purpose (and sometimes the use) of the debt has "some connection" to farming operations. *See In re Saunders*, 377 B.R. at 774–76 (collecting cases and concluding that "to arise out of a farming operation the purpose of a debt must have *some connection* to the debtor's farming activity" (emphasis added) (internal quotation marks omitted)); *In re Marlatt*, 116 B.R. 703, 705 (Bankr. D. Neb. 1990) ("[F]or a debt to arise out of a farming operation, there must be *a connection* between the debt and the debtor's farming activity." (emphasis added)).

Notably, in the instant case, the BAP adopted the some-connection test

27

from *In re Saunders*, holding that "to arise out of a farming operation the purpose of a debt must have some connection to the debtor's farming activity." Aplt. App. at 1382 (internal quotation marks omitted); *see also In re Hemann*, No. 11-00261, 2013 WL 1385404, at *7–8 (Bankr. N.D. Iowa Apr. 3, 2013) (relying on the BAP's decision here and applying the some-connection test). The BAP concluded that this test was met because the evidence supported the bankruptcy court's determination that *the purpose* of the construction loan was to construct a farmhouse and that purpose was "connected to the [Debtors'] farming activities." Aplt. App. at 1382–83.

However, we decline to adopt the some-connection test here. This test is inconsistent with our interpretation of the statutory phrase "arises out of." As we understand it, that phrase contemplates a direct and substantial connection between the debt "for" the principal residence and the farming operation. It follows perforce that a test requiring only *some* connection—no matter how tenuous and insubstantial, or indirect—between the principal-residence debt and the farming operation would dilute and conflict with this direct-and-substantial-connection standard. Moreover, we are reinforced in our view that the some-connection test is not the one that Congress envisioned because applying it in the context of the exception would almost certainly result in the exception swallowing the rule. For example, in many cases, it would not be difficult to envision a connection—however remote—between a family farmer's principal

28

residence and his farming operation. In other words, nearly every family farmer's principal residence could be said to have *some* connection to his or her farming operation; indeed, the connection could be as tenuous and insubstantial as the principal residence being the place where the farmer keeps the clothing in which he farms or the computer or telephone through which he places orders or sells his goods. Thus, were the some-connection test the operative one, the exception would almost certainly swallow the rule; this is not a result that we are prepared to conclude that Congress contemplated. *See Cuomo*, 557 U.S. at 530. Accordingly, we decline to endorse the some-connection test.

Ultimately, we conclude that—at least in the loan-debt context, as here—an objective "direct-use" test optimally fits with our direct-and-substantial-connection statutory standard. Such a test is singularly focused on whether the loan proceeds were directly applied to or used in a farming operation. This test appears to have begun with *In re Douglass*, 77 B.R. 714 (Bankr. W.D. Mo. 1987), where the court held that "the reason or purpose for which the debt was incurred coupled with the use to which the borrowed funds were put . . . should be the criteria to determine whether the debt 'arises out of a farming operation[.']" 77 B.R. at 715. But the test was subsequently modified in important ways by the bankruptcy court in *In re Kan Corp.*, 101 B.R. 726 (Bankr. W.D. Okla. 1988); it is the version of the test found there that we ultimately adopt.

The court in *In re Kan Corp.* focused solely on whether the loan proceeds

29

stemming from the debt were directly used in a farming operation. In that case, the debtor obtained a bank loan secured by his farmland to purchase a beer distributorship and obtained a second loan to pay off the first. *See In re Kan Corp.*, 101 B.R. at 726. The court reasoned:

> While it may be true that the purpose of [obtaining the second loan] was to save Debtor's farmland and that the proceeds of the farming operation were used to meet the payments on the loan, those facts are not material to the issue. Whether a debt incurred from a loan "arises out of farming operations" is determined by the *use made of the loan proceeds*. In this case, the [second] loan . . . went to pay off Debtor's obligation to [the first bank], and the proceeds of the [first] loan . . . were invested in a beer distributorship.

*Id.* at 727 (emphasis added). The court held that this debt did *not* "arise out of a farming operation" because the loan proceeds were used to purchase a beer distributorship—a business venture completely unrelated to farming operations. *Id.*

Significantly, in *In re Kan Corp.*, the court refused to consider "the motive of the debtor" to answer whether a debt arose out of a farming operation because looking to "the use made of the loan proceeds" provides "more objective criteria." *Id.*; *see also Otoe Cnty. Nat'l Bank v. Easton* (*In re Easton*), 883 F.2d 630, 636 (8th Cir. 1989) (rejecting the idea that "any loan secured by farmland" can be characterized as "arising out of a farming operation" "regardless of the purpose to

30

which the borrowed funds have been put"). [5] In short, in order to satisfy its objective direct-use test, the court held that "the proceeds of the loan must in some way be *directly applied to or utilized in* the farming operation." *In re Kan Corp.*, 101 B.R. at 727 (emphasis added).

Thus, we conclude that the version of the use test applied in *In re Kan Corp.*—an objective direct-use test—is the one that fully comports with the direct-and-substantial-connection standard, at least in the loan-debt context. Succinctly stated, a loan debt has a direct and substantial connection to a farming operation, and thus "arises out of" that operation, if "the proceeds of the loan" are "directly applied to or utilized in the farming operation." *Id.* For the reasons suggested in *In re Kan Corp.*, we reject a version of this test that would focus in part on the "motive of the debtor," *id.*; such a test would be less certain in its application because of the ultimately unfathomable nature of another's thoughts. The objective direct-use test that we adopt reflects an appropriately narrow construction of the exception; however, it leaves open plausible circumstances in which the exception could apply.

As the rule clearly envisions, in many instances, the proceeds of a debt "for" a principal residence will not be directly used in a farming operation,

---

[5]     Some courts, such as the Eighth Circuit in *In re Easton*, do not view an inquiry into the "purpose" of the loan as being an inquiry relating to the debtor's subjective intent; rather, they seek to identify the purpose of the loan by inquiring into how the loan proceeds are *actually used*. *See* 883 F.2d at 636. As applied, then, such a purpose test is essentially indistinguishable from an objective direct-use test.

31

because those proceeds would in fact be used instead to purchase or construct a residence.  Put another way, Congress surely envisioned that in many instances, the occupants of the principal residence may be farmers or the residence may be located on a farm, but the proceeds of the loan for the principal residence would not have been used for the activities constituting farming operations, such as "dairy farming, ranching, [or] production or raising of crops, poultry, or livestock."  11 U.S.C. § 101(21).

One can easily imagine, however, instances when the proceeds of a loan "for" a principal residence would be applied to such activities.  For example, a soybean farmer could obtain a second mortgage on his principal residence in order to buy soybean seeds for planting—and then in fact buy the seeds.  The mortgage would certainly amount to a debt "for" his principal residence. Furthermore, it is no less patent that the purchase of the seeds with the proceeds of that loan debt would constitute a "farming operation" within the meaning of 11 U.S.C. § 101(21); at the very least, it would involve "raising of crops." Accordingly, in this scenario, the proceeds from the principal-residence debt would have been directly used in a farming operation and, consequently, that debt would properly be deemed to "arise out of" the farming operation.  That is, the debt would properly be viewed as having a direct and substantial connection to the farming operation.

We need not fully explicate here the various situations in which the

exception could apply. For our purposes, it is sufficient to underscore that when the debt at issue is loan debt, asking solely whether the loan proceeds were directly used in farming operations (as statutorily defined) leaves room for the exception to operate—but, appropriately, only in limited circumstances.

In sum, we have interpreted the statutory term "arises out of" in the exception to the fifty-percent-farm-debt rule of 11 U.S.C. § 101(18)(A) as embodying a direct-and-substantial-connection standard, and we have identified a test that optimally serves—at least in the loan-debt context—as a vehicle for discerning whether that standard is satisfied—i.e., an objective direct-use test. We now turn to the facts of the instant case.

**B**

Debtors had the burden of establishing their eligibility for Chapter 12 relief. *See Ames v. Sundance State Bank* (*In re Ames*), 973 F.2d 849, 851 (10th Cir. 1992) ("Debtors [under Chapter 12] bear the burden of establishing all elements necessary for confirmation of a plan, including the feasibility of the plan."); *see also Tim Wargo & Sons, Inc. v. Equitable Life Assurance Soc'y* (*In re Tim Wargo & Sons, Inc.*), 869 F.2d 1128, 1130 (8th Cir. 1989) (noting in a Chapter 12 proceeding that "the burden was debtor's to elicit the relevant facts"); *cf. Hamilton Creek Metro. Dist. v. Bondholders Colo. Bondshares* (*In re Hamilton Creek Metro. Dist.*), 143 F.3d 1381, 1384–85 (10th Cir. 1998) ("The tests of insolvency are applied as of the time of filing, and the petitioner bears the burden

33

of proving one of them is met . . . ." (citation omitted)).

The bankruptcy court concluded that the construction loan arose out of a farming operation.  In support of this conclusion, the court stated that the residence was "an integral part of the farm operation *in* [*the*] *sense that*," first, "the farm's office, books, and records . . . are maintained at the farmhouse," and second, "that the proximity of these debtors to their hands-on, day-to-day, farming operation in terms of care of livestock and irrigation, that [the residence] isn't just incidental . . . [it] is where they live."[6]  Aplt. App. at 797 (emphasis added).

We begin by assessing whether the bankruptcy court's findings are sufficient to support its conclusion under our newly fashioned test.  To do so, we

---

[6]      Debtors view the bankruptcy court's statement that the residence was "an integral part of the farm operation" as a factual finding that we should review for clear error.  We disagree.  A complete reading of the bankruptcy court's statement demonstrates that the court concluded that the residence was "an integral part of the farming operation *in* [*the*] *sense that*" (1) the farm's office, books, and records were there, and (2) it was in proximity to the farming operation.  Aplt. App. at 797 (emphasis added).  The use of the phrase "in [the] sense that" makes clear that the bankruptcy court found that the residence was "integral" to the farming operation because of the two specific reasons it identified.  And, it in turn tacitly rendered the legal conclusion that the debt for this "integral" principal residence arose out of the farming operation.  However, because we conclude *infra* that the two reasons that the court relied upon are not sufficient to produce the legally required nexus between the principal residence (and its associated debt) and the farming operation—that is, they are insufficient to establish a direct and substantial connection between the two—the legal premise for the court's purported factual finding on the question of nexus (i.e., its "integral-part" finding) is in error; thus, we do not accord that finding a deferential standard of review.  *See Pahls*, 718 F.3d at 1232 ("It follows that if the district court commits *legal* error en route to a *factual* determination, that determination is thereby deprived of any special solicitude it might otherwise be owed on appeal.").

34

ask whether either of the two factors upon which the court relied allows us to conclude that the construction loan is directly and substantially connected to Debtors' farming operation. We answer in the negative, recognizing that in the loan-debt context, our true focus must be on whether the loan proceeds from the construction loan were directly used in the farming operation.

It is undisputed that the construction loan was used to build Debtors' principal residence. Merely because the residence contained the farming operation's office, books, and records does not mean, however, that the proceeds of the loan were "directly applied to or utilized in the farming operation." *In re Kan Corp.*, 101 B.R. at 727. In other words, the fact that the residence contains an office and the farming operation's books and records has not been shown by Debtors to be anything more than an incidental matter.[7] Were we to hold that

---

[7] With respect to the office, we do not categorically exclude the possibility that a debt for the construction of an office in a principal residence could be found to "arise out of" a farming operation. Put another way, we do not categorically negate the possibility that some of the funds stemming from a principal-residence debt actually could be used in a farming operation—that is, "arise out of" a farming operation—because a portion of the principal residence that was built with those loan funds was directly and substantially connected to farming operations, as defined in § 101(21). However, Debtors have failed to adequately demonstrate that such a possibility may be present here; nor have they specifically provided us with a legal or factual basis for parsing out the portion of their principal-residence debt used to construct the office. Here, the only evidence relied on by Debtors regarding the office is the bankruptcy court's finding that it was in the residence and Mr. Woods's testimony that "we made one bedroom [in the residence] larger specifically for an office." Aplt. App. at 288 (Hr'g Tr., dated May 6, 2011). Such evidence is insufficient for us to conclude that a portion of the proceeds from the construction loan was directly and substantially connected to a farming operation—that is, directly used in a farming operation.

such a facially tenuous connection to a farming operation was sufficient, the exception would swallow the rule—that is, virtually every family farmer's principal residence could be deemed to arise out of a farming operation.

The second factor that the bankruptcy court relied upon rests on an even weaker foundation. The proximity of the residence to the farming operation is irrelevant to how the proceeds of the construction loan were used. The fact that Debtors' principal residence is located on the farm cannot reasonably lead us to conclude that the funds derived from the construction loan were directly used in the farming operation itself. Indeed, quite the opposite is true; at best, the funds derived from the construction loan were *indirectly* used in the farming operation because they allowed Debtors to construct a residence, which in turn provided convenient access to the farming operation.

Put most simply, the debt "for" the principal residence arose out of Debtors' need to have a place to live, not out of the activities constituting farming operations under 11 U.S.C. § 101(21). To the extent that their living in proximity to the farming operation could be said to have facilitated Debtors' farming operation, that fact alone would not be legally sufficient to make the loan debt that was incurred to construct the principal residence debt that "arises out of" the farming operation. In other words, in such a circumstance, the proceeds from the loan debt were not directly used *in* the farming operation, such that they could be deemed to be directly and substantially connected to that operation. Once again,

36

were we to hold otherwise, the exception would swallow the rule. Notably, when asked whether "most hay farmers and horse ranchers live on their farms," Mr. Woods testified that, "[t]o [his] knowledge, virtually all of them do that [he] know[s]." Aplt. App. at 289.

In short, under the interpretation of the statutory phrase "arise out of" that we articulate here—which contemplates a direct and substantial connection between the principal-residence debt and the farming operation—and under the test that is congruent with this statutory interpretation, the objective direct-use test, the bankruptcy court committed legal error. Specifically, it did so in concluding that two attributes of Debtors' principal residence—(1) that it contains an office and the farming operation's books and records, and (2) that it is located in proximity to the farming operation—were legally sufficient to classify debt that was incurred for the principal residence as debt that arose out of a farming operation.

When we find legal error, we ordinarily do not "weigh the facts . . . and reach a new conclusion; instead, [we] must remand to the [trial] court for it to make a new determination under the correct law." *United States v. Hasan*, 609 F.3d 1121, 1129 (10th Cir. 2010). We follow such a course here, out of an abundance of caution and in the interest of justice, because we have difficulty concluding that the record leads ineluctably to only one result. *See Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982) ("[W]here findings are infirm

37

because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue.").

To be sure, consistent with this opinion and its factual setting, we are confident that ordinarily the proximity of a farmer's principal residence to his farming operation—viewed in isolation—will be legally irrelevant to the question of whether the debt "for" that residence "arises out of" a farming operation. Furthermore, standing alone, the *mere presence* of an office in a farmer's principal residence ordinarily will not be sufficient to establish that the debt "for" the office portion of that principal residence "arises out of" a farming operation. But as we observed above, *see supra* note 7, we do not categorically exclude the possibility that a debt for the construction of an office in a principal residence could be found to "arise out of" a farming operation. With the legal landscape now properly defined in this opinion, we believe that Debtors should have an opportunity in the context of a remand to try to establish facts regarding their office supportive of this legal characterization (i.e., "arises out of" a farming operation) and possibly other facts as well that may have some material bearing on their eligibility for Chapter 12 relief.[8]

Lest there be any doubt: we do not express any opinion on the likely outcome of the bankruptcy court's application to the facts of this case of the

---

[8] Because we do not decide whether Debtors are eligible for Chapter 12 relief, we need not reach the other issues that First National Bank raises regarding the confirmation of Debtors' Chapter 12 plan.

proper legal principles—including our newly articulated objective "direct-use" test. Rather, as in *Hasan*, "we simply conclude that findings under the proper legal standard . . . are a necessary condition for our review and, accordingly, a remand is required." 609 F.3d at 1131.

### III

Because the bankruptcy court failed to apply the correct legal standard and test in determining whether the debt "for" Debtors' principal residence "arises out of a farming operation," we **VACATE** the bankruptcy court's judgment and **REMAND** the case to the bankruptcy court to conduct a proper legal analysis—involving notably our newly stated objective "direct-use" test—and for further proceedings consistent with this opinion.